**Charles BURKE, Plaintiff,**

v.

**ROYAL INSURANCE COMPANY, Defendant.**

No. 97 CV 3387(RJD).

United States District Court, E.D. New York.

March 15, 1999.

Charles Burke, for pro se.

Joel L. Finger, Gregory Reilly, Roberts & Finger, LLP, New York City, for defendant.

### MEMORANDUM & ORDER

DEARIE, District Judge.

In the attached Report and Recommendation dated February 2, 1999, Magistrate Judge Steven M. Gold recommends that defendant's motion for summary judgment be granted and plaintiff's motion to amend the complaint be denied. Objections to the Report and Recommendation were due on February 18, 1999. No objections have been received by this Court. The Court adopts the Magistrate's recommendations.

In adopting the Report and Recommendation, this Court need not conclude that Mr. Burke is disabled under the Americans With Disabilities Act. The Court instead assumes that Mr. Burke is disabled and concurs in concluding that plaintiff has simply failed to raise a genuine issue of material fact on the question of pretext. Further, the Court declines to exercise supplemental jurisdiction over the state law claims.

The Clerk of the Court is hereby directed to close the case.

SO ORDERED.

### REPORT AND RECOMMENDATION

GOLD, United States Magistrate Judge.

### Introduction

Charles Burke, plaintiff *pro se*, brings this action against his former employer for disability discrimination pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and the New York State Human Rights Law, N.Y.Exec. Law § 296, for breach of contract, for intentional infliction of emotional distress, and for defamation. On July 29, 1998, plaintiff moved to amend his complaint to add claims for a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and for wrongful discharge. On December 7, 1998, defendant Royal Insurance Company ("Royal") moved for summary judgment on the original complaint.

By orders dated September 16, 1998 and January 7, 1999, the Honorable Raymond J. Dearie referred both pending motions to me for report and recommendation. For the reasons stated below, I respectfully recommend that defendant's motion for summary judgment be granted, and that plaintiff's motion to amend the complaint be denied.

### Facts

**Burke's Disability**

Burke was diagnosed with Type II Diabetes in 1986, for which he was prescribed oral diabetes medication. Am.Compl. at ¶ 14–15. In March 1996, Burke's diagnosis changed to Type I diabetes, and he has been insulin dependent since that time. *Id.* at ¶ 16–17. On March 12, 1996, as a result of his diabetes, one of Burke's big toes was amputated after an infection became gangrenous. Burke was immediately placed on short term disability. On the day of the amputation and while still in the hospital, Burke received a phone call from his supervisor at Royal Insurance Company, Joseph Koloski. Koloski told Burke that he had received a poor performance appraisal for 1995, and informed Burke that his company car would have to be returned while he was out on short term disability. Pl.'s Mem. of Law at 3.[1] Burke claims that the timing of the Koloski phone call caused him emotional distress. Am.Compl. at ¶ 22.

Burke returned to work at the Jericho, New York office from short term disability in August 1996. On the same day that he returned to work, Royal terminated his employment citing the decrease in business at the Jericho branch and his poor work performance. Burke asserts that he

---

1. "Pl.'s Mem. of Law" refers to Plaintiff's Memorandum of Law in Argument Against

Defendant's Motion for Summary Judgment, dated November 5, 1998.

was terminated because of his disability. *Id.* at ¶ 26.

### Burke's Work History at Royal

Defendant denies plaintiff's claim of disability-based discrimination, and contends that plaintiff was fired for legitimate, business reasons. More specifically, defendant asserts that its business was shrinking, and that management decided that one of the three field auditor positions at its Jericho office should be eliminated. As mandated by defendant's employee handbook, plaintiff was selected for dismissal because his performance evaluations were poorer than those of the two other field auditors working at the Jericho office.

To assess whether plaintiff has raised a genuine issue of fact with respect to defendant's proffered legitimate, business reason for his termination, it is important to review plaintiff's work history at Royal. Defendant Royal hired Burke as an Assistant Auditor in July 1969. Defendant's Local Rule 56.1 Statement ("Def.'s Rule 56.1 Stmt.") at ¶ 2.[2] Royal's premium auditors were responsible for reviewing the books and records of Royal's insureds at or about the time the insured's policies came up for renewal, to determine whether and to what extent Royal should adjust the premiums it demanded. Burke Dep. at 32.

From 1969 through 1991, Burke worked in several internal audit positions with Royal. In 1991, Royal transferred Burke to the Premium Audit Department in Royal's Manhattan office and give him the title of Resident Auditor. Def.'s Rule 56.1 Stmt. at ¶ 5. Burke received an overall rating of "needs improvement" on his 1992 performance appraisal based largely on low productivity for the year. *Id.* at ¶ 9. As a result of the poor performance review, Burke was passed over for promotion.

In 1993, Royal transferred Burke to the Premium Audit Department in the Jericho, New York office and gave him the title of Senior Auditor. Despite the change in title from Resident Auditor to Senior Auditor, Burke considered the transfer a demotion because he no longer had any supervisory responsibilities. *Id.* at ¶¶ 12–13. The position in the Jericho office required Burke to conduct "field audits" (audits conducted at a client's offices), as opposed to the "desk audits" (audits conducted in Royal's offices upon receipt of a client's books and records) he was more familiar with in the Manhattan office. *Id.* at ¶¶ 14–16.

Joseph Koloski, the manager of the Jericho office's Premium Audit Department, was Burke's supervisor. *Id.* at ¶ 18. In addition to Burke, two other Senior Auditors in the Jericho office, Robert McNally and Joseph Capozzi, reported to Koloski. *Id.* at ¶ 19. Both McNally and Capozzi had considerably more experience than Burke conducting field audits for the Premium Audit Department.

Burke's problems in the Jericho office began shortly after his transfer there. In January 1994, Burke and Koloski conferred about Burke's continuing productivity problems and devised a strategy to improve Burke's performance. Burke related to Koloski that his productivity problems were attributable to his mother's impending death from cancer. *Id.* at ¶ 25. Koloski tried to help Burke "get through"

---

**2.** Local Rule 56.1 provides that a party moving for summary judgment must include a "separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried." Royal's Local Rule 56.1 statement is carefully annotated and refers to declarations, affidavits, and exhibits also submitted with the motion. Accordingly, most of the citations in the text are to Royal's Local 56.1 statement.

As discussed in greater detail below, Burke did not submit a Local Rule 56.1 statement. Because Burke is proceeding *pro se,* I will construe Burke's Memorandum of Law, submitted in opposition to defendant's motion for summary judgment, as meeting the requirements of the Rule. Any factual assertions by the plaintiff in contradiction to defendant's Local Rule 56.1 Statement will be noted.

his personal problems by performing some of Burke's field audits himself in the early part of 1994. *Id.* at ¶ 27.

Royal evaluated the productivity of its auditors by tracking the number of audits each completed per month, and the percentage of audits completed within a certain number of days of the expiration of the underlying policy. Through 1994, auditors were expected to complete, on average, 40 audits per month and to complete 90% of all audits within sixty days of policy expiration. Beginning in 1995, auditors were expected to complete, on average, 22 audits per month and to complete 90% of all audits within forty-five days of policy expiration. Burke's annual performance appraisal for 1993, which he received in March 1994, revealed that Burke was not meeting Royal's productivity standards. Burke completed, on average, less than 30 audits per month. *Id.* at ¶ 31. In addition, Burke completed only 53.7% of his audits within sixty days of policy expiration. Burke received an overall rating of "needs improvement" in his 1993 performance appraisal. *Id.* at ¶ 34.

In an attempt to help Burke, Koloski and his supervisor, Bill Walsh, lowered Burke's timeliness goal to 80% of all audits completed within 60 days after policy expiration. The timeliness goal for McNally and Capozzi remained at 90%. *Id.* at ¶¶ 37–38. Burke could not meet even the lowered standard, and, as a result, he was placed on a probationary status known as Counseling for Improved Performance ("CFIP") in August 1994. In a letter from Koloski advising him of his CFIP status, Burke was warned that, if his performance did not improve, "further disciplinary action may be taken up to and including termination." *Id.* at ¶¶ 40–42.

The letter informing Burke of his CFIP status also highlighted a possible reason for Burke's failure to meet the timeliness and quantity requirements demanded by Royal. Royal encouraged its premium auditors to make use of a procedure known as an office adjustment. In cases where the auditor had trouble scheduling and performing a field audit, Royal permitted its auditors to estimate the new premium without examining the client's books and records. *Id.* at ¶ 43. Office adjustments were reflected on productivity reports as completed audits. Burke testified at his deposition that he rarely used the office adjustment procedure because he felt that it deprived Royal of the information it needed to determine whether its new premiums were too low. *Id.* at ¶ 44.

Royal removed Burke from CFIP status in December 1994 after he attained the 80% timeliness requirement. However, because he was on CFIP status for four months of 1994, Burke again received a "needs improvement" rating on his 1994 performance appraisal. *Id.* at ¶ 46. Burke completed, on average, less than 30 audits per month and only 46.9% of his assigned audits within sixty days of policy expiration. *Id.* at ¶¶ 47–48. Burke asserts that the number of audits that he completed reflected a drop in the total number of audits that he was assigned as Royal's business shifted from audits of a larger number of smaller insureds to a smaller number of larger insureds. Burke Dep. at 253, 256–57; Koloski Aff. at ¶ 9. As a result of the changing business environment, the number of employees at Royal's Jericho office declined from 107 in 1993 to 58 in 1996. Koloski Aff. at ¶ 10. Acknowledging the decrease in the total number of audits, Koloski, nevertheless, rated Burke's performance in his 1994 appraisal as "needs improvement," because Burke's performance lagged behind that of both McNally and Capozzi. Def.'s Rule 56.1 Stmt. at ¶ 55–56.

As a result of the shift toward fewer audits of larger clients, Royal revised its company-wide targets to 22 field audits per month, with 90% completed within forty-five days after policy expiration. *Id.* at ¶ 57–58. In Burke's 1995 performance appraisal, he received an overall rating of "unsatisfactory." Despite completing slightly more audits per month compared

to his two co-workers, which Royal attributes to Burke's finishing many simpler, overdue audits, his timeliness rating was still well below the 90% target. *Id.* at ¶ 65. Capozzi and McNally each completed 89.0% and 88.5%, respectively, of their audits within 45 days of policy expiration; Burke, however, completed only 56.0% of his audits within 45 days. *Id.* at ¶ 67. Burke did not receive his 1995 performance evaluation until September 1996 because, as discussed above, he was hospitalized in March 1996 and left work on short term disability.

In July 1996, Koloski, in consultation with the department's new manager, Jim Moreen, decided to eliminate one of the three field auditor positions as a result of the decrease in work at the Jericho office. *Id.* at ¶¶ 78–79. Defendant argues that Koloski decided which of his three field auditors to terminate by following guidelines established in Royal's employee handbook. The relevant provisions of the handbook required supervisors to consider performance over the preceding two years when deciding who should be retained when positions are eliminated. Koloski determined that Burke, whose performance evaluations were less favorable than the evaluations of McNally or Capozzi, should be terminated. *Id.* at ¶¶ 80–84. When Burke returned from short term disability on August 13, 1996, Royal terminated Burke and paid him twenty weeks severance.[3]

Burke disputes Royal's assertion that his performance was the real reason for his dismissal. According to Burke, a comparison of his appraisal to McNally's and Capozzi's appraisals reveals that all three Senior Auditors had similar numbers of positive and negative comments on their evaluation forms. Pl.'s Mem. of Law at 2–3. Burke maintains that the only difference between himself and the other auditors was in the higher overall ratings received by McNally and Capozzi, which Burke attributes to the necessity of grading employees on a "curve." *Id.*

## Discussion

### A. Summary Judgment

It is well-settled that a party seeking summary judgment must establish that there is no genuine issue of material fact in dispute and that the moving party is therefore entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). Further, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

If the moving party discharges its burden of proof under Rule 56(c), "[t]he non-moving party has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" *Phillips v. Kidder, Peabody & Co.,* 782 F.Supp. 854, 858 (S.D.N.Y.1991) (quoting Fed. R.Civ.P. 56(e)). Moreover, "Rule 56(e) ... provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. Rather, to defeat a properly supported motion for summary judgment, the non-movant must make an affirmative showing of sufficient evidence that would enable a jury to return a verdict in the non-movant's favor. *Id.* at 249, 106 S.Ct. at 2511. In deciding a motion for summary judgment, "the trial court's task ... is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to

---

**3.** Further reductions in work at the Jericho office led to McNally's termination in Novem- ber 1997. Def.'s Rule 56.1 Stmt. at ¶ 92.

deciding them." *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 65 (2d Cir.1995) (quoting *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994)).

When a summary judgment motion is opposed by a *pro se* plaintiff, a court must " 'read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest.' " *Lee v. Coughlin,* 902 F.Supp. 424, 429 (S.D.N.Y.1995) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)), *reh'g granted on other grounds,* 914 F.Supp. 1004 (S.D.N.Y.1996); *see also Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir.1988) (noting that "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment") (citing *Sellers v. M.C. Floor Crafters, Inc.* 842 F.2d 639, 642 (2d Cir.1988)). A *pro se* plaintiff's "bald assertion," made without any evidentiary support, however, "is not sufficient to overcome a motion for summary judgment." *Lee,* 902 F.Supp. at 429 (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)); *see also Kadosh v. TRW, Inc.,* No. 91 CV 5080, 1994 WL 681763 at *5 (S.D.N.Y. 1994) ("The work product of *pro se* litigants should be generously and liberally construed, but [plaintiff's] failure to allege either specific facts or particular laws that have been violated, renders his attempt to oppose defendants' motion [for summary judgment] ineffectual.").

Defendant supports its motion for summary judgment with a declaration (including exhibits), three affidavits, and a Local Rule 56.1 statement. Plaintiff's response consists only of a nine page memorandum of law. Further, plaintiff's recitation of the facts of this case is not sworn, and his factual allegations in support of his claim of disability-based discrimination are meager. Thus, Burke has failed to meet the requirements of Fed.R.Civ.P. 56(e) ("[O]pposing affidavits shall ... set forth such facts as would be admissible in evidence....").[4] However, because plaintiff Burke is proceeding *pro se,* I respectfully recommend that his failure to file a Local Rule 56.1 statement, or to present factual material in evidentiary form, be excused, and that defendant's motion for summary judgment be analyzed in light of the entire record before the Court, including Burke's memorandum of law and proposed amended complaint.

## B. Disability–Based Discrimination

In an employment discrimination case such as this one, courts employ the familiar burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). First, plaintiff must prove, by a preponderance of the evidence, a prima facie case of discrimination. *Luciano v. Olsten Corp.,* 110 F.3d 210, 215 (1997) (citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510 n. 3, 113 S.Ct. 2742, 2748 n. 3, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)). If plaintiff is able to state a prima facie case of discrimination, "the burden of production then shifts to the defendant to articulate a nondiscriminatory reason for the challenged employment decisions ...." *Luciano,* 110 F.3d at 215 (citing *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094). "[O]nce the defendant proffers a legitimate motive, the presumption of discrimination triggered by the prima facie case no longer operates." *Id.* (citing *St. Mary's,* 509 U.S. at 507, 113 S.Ct. at 2747). Finally, "the plaintiff has

---

4. As a *pro se* plaintiff, Burke was apprised of his right and responsibility to conduct discovery at various court conferences. *See, e.g.,* Docket Entry 19 (Feb. 27, 1998) (advising plaintiff to proceed with interrogatories, document requests, or depositions upon written questions and discussing the impending summary judgment motion); Docket Entry 22 (Apr. 30, 1998); Docket Entry 27 (July 10, 1998). From a review of the court file, it appears that the only discovery conducted by Burke was a deposition upon written questions of Koloski.

the opportunity to demonstrate that defendant's articulated reason for its decision is in fact a pretext for discrimination and retains the ultimate burden of persuasion to demonstrate by a preponderance of the evidence that the challenged employment decision was the result of intentional discrimination." *Id.* (citing *St. Mary's,* 509 U.S. at 507–08, 113 S.Ct. at 2747–48); *see also Hendler v. Intelecom USA, Inc.,* 963 F.Supp. 200, 203–04 (E.D.N.Y.1997) (applying *McDonnell Douglas* analysis to ADA claim).[5]

### 1. Burke's Claim of Disability

■ To state a prima facie case under the ADA, Burke must show: "(1) [he] is a disabled person; (2)[he] is otherwise qualified to perform [his] job; and (3)[he] was discharged because of his disability." *Schaefer v. State Insurance Fund,* No. 95 CV 0612, 1998 WL 126061 at *5 (S.D.N.Y. 1998) (citing *Wernick v. Federal Reserve Bank of New York,* 91 F.3d 379, 383 (2d Cir.1996)). The ADA defines disability as "a physical or mental impairment that substantially limits one or major life activities of such individual;" "a record of such an impairment; or" "being regarded as having such an impairment." 42 U.S.C. § 12102(2).

Royal first argues that Burke is not disabled within the meaning of the ADA because he does not meet the statutory definition of disability. Def.'s Mem. of Law at 16. At the time of Burke's dismissal in August 1996, he was a Type I, insulin-dependent diabetic. The courts that have considered whether diabetes is a disability under the ADA have first focused on whether the benefits of taking ameliorative medications should be considered when deciding if diabetes "substantially limits" a "major life activity." The majority of courts have concluded that a plaintiff with insulin-dependent diabetes is disabled under the ADA. *See, e.g., Arnold v. United Parcel Svc., Inc.,* 136 F.3d 854 (1st Cir.1998) (extensively examining the language of the ADA, the legislative history, the broad remedial purpose behind the ADA, the EEOC's interpretative guidelines, and judicial interpretations, concluding that, in the case of diseases like diabetes, "substantial limitation of a major life activity" should be determined by looking at the underlying condition without ameliorative medications, and holding that diabetes is a disability under the ADA); *Schaefer,* 1998 WL 126061 at *6 (adopting rationale of First Circuit's decision in *Arnold,* and concluding that the majority of Courts of Appeals agree with the *Arnold* court's approach); *see also Hendler,* 963 F.Supp. at 205–07 (in a case involving asthma as an asserted disability, reviewing conflicting case law and concluding that disability should be determined without regard to ameliorative measures).

■ Equal Employment Opportunity Commission ("EEOC") regulations support the conclusion that insulin-dependent diabetes is a disability within the meaning of the ADA. Agency regulations, such as those promulgated by the EEOC, are entitled to deference, unless the plain language of the underlying statute is clear. *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Interpretative guidelines, although not controlling on federal courts, "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (internal quotations omitted) (citations omitted). The EEOC, the federal agency charged with implementing the ADA, has promulgated regulations and

---

5. The *McDonnell Douglas* framework also applies to claims of discrimination under the New York Human Rights Law, N.Y.Exec.Law § 296. *See Song v. Ives Laboratories, Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992); *Ortega v. New York City Off–Track Betting Corp.,* No. 97 CV 7582, 1998 WL 355416 at *3 n. 2 (S.D.N.Y.1998). Accordingly, I will not discuss Executive Law § 296 separately.

guidelines indicating that a disability should be assessed without regard to ameliorative medications and that insulin-dependent diabetes is a disability within the meaning of the ADA. *See* 29 C.F.R. § 1630.2(j)(1)(ii) (the term "substantially limits" contained in the definition of disability means, *inter alia*, "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"); Appendix to 29 C.F.R. § 1630.2(j) (noting, in interpretive guidelines, that a disability should be assessed "without regard to mitigating measures such as medicines," and that "a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication") (citing H.R.Rep. No. 101–485 pt. 11, at 52 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 334 (insulin-dependent diabetes constitutes a substantial limitation on a major life activity); S.Rep. No. 101–116, at 23 (1989) (same)).

Only a few decisions have concluded that an impairment should be assessed in its treated state. One involved non-insulin dependent diabetes and was the product of a divided court. *See Gilday v. Mecosta County*, 124 F.3d 760, 766 (6th Cir.1997) (Kennedy J., concurring in part and dissenting in part) (voting two to one that the ADA requires that the disability be considered after taking into account mitigating measures). Another involved an easily correctable ailment. *See Sutton v. United Air Lines, Inc.*, 130 F.3d 893 (10th Cir. 1997) (nearsightedness corrected with prescription lenses), *cert. granted,* —— U.S. ——, 119 S.Ct. 790, 142 L.Ed.2d 653 (1999).[6]

Royal's argument that Burke was not disabled are not persuasive. First, Royal's reliance on Burke's testimony that he was not limited in his ability to "drive, read, walk, talk, concentrate on problems and use the computer," *see* Def.'s Mem. of Law at 16–17, fails to consider that Burke would have such limitations if he did not take the required insulin. In addition, Royal's focus on the effect of Burke's diabetes on his work fails to recognize that the ADA defines disability as a substantial limitation on a major *life* activity, not a major *work* activity. *See Bragdon*, 118 S.Ct. at 2205 (rejecting notion that the substantial limitation must involve a person's public, economic, or work life). Fi-

**6.** The recent decision in *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the first decision from the Supreme Court interpreting the definition of disability, supports the conclusion that diabetes is a disability under the ADA. The Court in *Bragdon* held that asymptomatic human immunodeficiency virus (HIV, the virus that causes acquired immune deficiency syndrome (AIDS)) is a disability under the ADA because it substantially limits the major life activity of reproduction. *Id.* at 2209. "[A] number of *amici*" argued "HIV's profound impact on almost every phase of the infected person's life." *Id.* at 2205. The Court, however, limited its discussion to the major life activity of reproduction because that was the only argument advanced by the plaintiff.

Because both HIV and diabetes, left untreated, are clearly life threatening, one could conclude that diabetes, like HIV, is a disability under the ADA. Moreover, HIV's substantial limitation on a person's blood and lymp-

hatic systems, *see Bragdon*, 118 S.Ct. at 2203 (describing such effects), as well as the obvious limitation on reproduction is analogous to diabetes' substantial limitation on a person's digestive system. Without treatment a person infected with HIV is likely to develop AIDS, an incurable disease. Without treatment, including daily doses of insulin, an insulin-dependent diabetic is likely to lapse into a coma and die. *See Erjavac v. Holy Family Health Plus*, 13 F.Supp.2d 737, 743–49 (N.D.Ill.1998) (concluding, based on *Bragdon*, that "a disease need not produce continuous, identifiable ... symptoms in order to constitute an impairment" and that a substantial limitation need not be a complete barrier to a major life activity, reciting expert testimony that "an insulin-dependent diabetic would be likely to suffer a coma or worse if unable to administer insulin as needed," and holding insulin-dependent diabetes to be a disability under the ADA).

nally, Royal's reliance on Burke's diabetic condition in March 1996 rather than in August 1996, when the adverse employment decision was made, fails to consider that Burke's condition deteriorated after March 1996, when his diabetes changed from Type II to Type I. For all these reasons, and based upon the above cited judicial authority, and the regulations and interpretive guidelines of the EEOC, I conclude that Burke's type I, insulin-dependent diabetes constitutes a disability within the meaning of the ADA.

### 2. Burke's Prima Facie Showing of Discriminatory Treatment

■ To shift the burden to Royal to present a nondiscriminatory reason for terminating him, Burke, in addition to showing that he is disabled, must make out a prima facie case that he was terminated because of his disability. Royal argues that even if Burke is disabled, he is unable to state a prima facie case of disability discrimination because "nothing about the conduct or circumstances surrounding the decision to terminate Burke's employment gives rise to an inference of disability discrimination." Def.'s Mem. of Law at 18. However, the submissions of a *pro se* litigant, such as Burke, must be read liberally, and must be interpreted to raise the strongest arguments that they suggest. *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Further, there is rarely direct evidence of the requisite intent in discrimination cases such as this one, and a court must therefore carefully scrutinize the record for any circumstantial evidence supporting an inference of discrimination before granting summary judgment. *Chertkova v. Connecticut General Life Ins. Co.,* 92 F.3d 81, 87 (2d Cir.1996).

■ Given Burke's *pro se* status and the difficulty in showing direct evidence of discrimination, I conclude that there is sufficient circumstantial evidence for plaintiff to state a prima facie case. First, there is the phone call made by Koloski to Burke while Burke was in the hospital. Although

the parties disagree over whether Koloski knew when he called that Burke's toe had already been amputated, it is undisputed that Koloski knew that Burke was in the hospital suffering complications from diabetes and that amputation was a possibility. A prima facie showing of discriminatory intent might arguably be inferred from the callousness of Koloski's phone call, made to inform Burke, while bed-ridden and hospitalized, that his company car had to be returned and that he had received a poor performance evaluation for 1995.

Burke's prima facie showing is further supported by the timing of his dismissal. On the very day that Burke returned from short term disability, he was informed that he would be terminated. Yet, the reasons for Burke's termination advanced by Koloski had been known for some time. Burke had a history of at least three years of poor performance evaluations prior to the decision to terminate him. Moreover, the evidence in this case suggests that, as early as the beginning of 1995, Royal was aware of the change in its business and the reduced number of audits that were required. Burke's poor performance, standing alone or in combination with the reduced work load, would have been a sufficient basis for terminating Burke. Royal, however, waited to terminate Burke until he returned from short term disability. Based simply on the timing of Burke's dismissal, I conclude that Burke has made a sufficient showing to shift the burden of presenting a non-discriminatory basis for termination to Royal.

### 3. Royal's Showing of a Legitimate Reason for Burke's Termination

■ Royal has produced ample evidence of a nondiscriminatory reason for Burke's termination. As noted above, Royal asserts that it reasonably decided to reduce its staff and that, pursuant to guidelines in its employee handbook, Royal properly concluded that Burke, who had the weakest performance evaluations of anyone in

the relevant group, should be the person discharged.

First, Royal asserts without contradiction that the number of premium audits that were required in the Jericho office was decreasing. Koloski Aff. at ¶ 10, Hartman Aff. at ¶¶ 3–4. An example of the change in Royal's business is evidenced by the change in 1995 from a target of 40 audits per month to only 22 audits per month for each of the Senior Auditors. Additionally, Burke's position was left vacant after he was fired, and another Senior Auditor, McNally, was terminated approximately fourteen months later.

Second, from 1991, when Burke worked in the Manhattan office's Premium Audit Department, until 1996, when he was terminated, each performance appraisal that Burke received was either "unsatisfactory" or "needs improvement." Burke now alleges that, although his co-workers received better overall ratings, they had a similar number of individual positive and negative comments. The performance statistics, however, tell another story. For example, in 1994, Burke, Capozzi, and McNally each completed an average of 30 audits per month. Def.'s Rule 56.1 Stmt. at ¶ 56. However, Burke completed, on average, only 46.9% of his audits within sixty days of policy expiration. Id. In the same sixty day period, Capozzi completed, on average, 89.7% of his audits, and McNally completed, on average, 74.4% of his. Id. In 1995, Burke completed, on average, approximately 20 audits per month, as compared to 18.9 audits per month for Capozzi and 17.7 audits per month for McNally. Id. at ¶ 64. Koloski attributes Burke's completing slightly more audits, on average, per month than his colleagues to Burke's finishing many simpler, overdue audits. Id. at ¶ 65. Under Royal's revised performance standard of 90% of audits completed within forty-five days of policy expiration, however, Capozzi completed 89%, McNally completed 88.5%, and Burke completed only 56%

of assigned audits within the specified time. Id. at ¶ 83. Burke does not dispute these statistics. Burke Dep. at 157–58. When Royal terminated Burke, it did so pursuant to a policy, disseminated in the employee handbook, that required it to consider the relative strengths and weaknesses of affected individuals before making any reductions in staff. Thus, Koloski's decision to terminate Burke, rather than McNally or Capozzi, is supported by Burke's poor performance statistics and his poor performance evaluations overall and in comparison to his coworkers. I conclude, therefore, that Royal has met its burden of showing a legitimate nondiscriminatory reason for terminating Burke.

### 4. Burke's Showing of Pretext

Because Royal has come forward with evidence of a legitimate, nondiscriminatory basis for Burke's termination, the burden now shifts back to Burke, who must demonstrate that Royal's stated basis for his termination is pretextual, and that the real reason he was fired was because of his disability. St. Mary's, 509 U.S. at 507–08, 113 S.Ct. at 2747–48. Burke, simply said, has put forth no evidence that the proffered reason for his termination, poor performance and a reduction in workload, was a pretext for discrimination. Although the timing of Burke's dismissal and the delay in terminating him despite poor performance and a reduced workload are enough to suggest a prima facie case of discrimination, these few isolated facts are wholly insufficient to raise an issue of fact for trial. Accordingly, I respectfully recommend that Royal's motion for summary judgment dismissing Burke's ADA and New York Human Rights Law claims be granted.

### C. Supplemental State Law Claims

 In addition to asserting disability-based discrimination in violation of federal and state law, Burke asserts claims for breach of implied contract, intentional infliction of emotional distress, and defama-

tion in his original complaint. Given that I have recommended that summary judgment be granted dismissing the only federal question claim, I accordingly recommend that the District Court decline to exercise supplemental jurisdiction over these remaining state law claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3).

Even if this court were inclined to exercise supplemental jurisdiction over these state law claims, each claim would be found to lack merit. Burke's breach of implied contract claim essentially asserts that Royal breached the terms of its employee handbook by engaging in disability-based discrimination. Putting aside that Burke was an employee-at-will, this claim must be dismissed for the same reason that the underlying disability claim cannot survive defendant's motion for summary judgment. Burke's claim of intentional infliction of emotional distress also lacks merit. This claim is primarily based upon Koloski's phone call to Burke while Burke was in the hospital, and Royal's decision to terminate Burke immediately upon his return from disability leave. Burke has not demonstrated that Koloski intended to inflict emotional distress, nor has he explained how Koloski's callousness is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *See Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 303, 448 N.E.2d 86, 90, 461 N.Y.S.2d 232, 236 (1983) (citing Restatement of Torts, Second, § 46, subd. [1], comment d). Finally, with respect to the defamation claim, Burke has conceded that he has no evidence supporting such a claim. *See* Burke

Dep. at 146–49. Burke's vague assertions of certain inconsiderate remarks made by unnamed individuals, raised for the first time in his memorandum in opposition, *see* Pl.'s Mem. of Law at 8, are insufficient to state a claim of defamation and, given that they were allegedly made in 1992, are undoubtedly time barred. *See* N.Y.C.P.L.R. 215(3) (statute of limitations for libel and slander is one year).

### D. Amended Complaint

Plaintiff moves to amend his complaint to add claims for violation of ERISA and for wrongful discharge.[7] Plaintiff asserts that his termination violated ERISA § 510, 29 U.S.C. § 1140, which provides, *inter alia,* that "[i]t shall be unlawful for any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...." In particular, plaintiff asserts that his termination did not allow him to reach "normal retirement age," thereby preventing him from receiving certain, unspecified employee benefits and payments. Am.Compl. at ¶ 57.

Defendant argues that Burke's motion to amend the complaint should be denied because the proposed new claims are futile. *See Richardson Greenshields Securities, Inc. v. Lau,* 825 F.2d 647, 653 n. 6 (2d Cir.1987) (noting that "[a] motion to amend should be denied only for such reasons as 'undue delay, bad faith, futility of the amendment, and ... the resulting prejudice to the opposing party' ") (cita-

---

7. In plaintiff's Reply Memorandum of Law on the motion to amend the complaint, he refers to the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq. See* Pl.'s Reply Mem. of Law at 2. Except for two isolated references to the ADEA, one of which explains that plaintiff at one point contemplated withdrawing any reliance upon that

statute, plaintiff has offered no evidence in any form that his termination was the result of age-based discrimination. Thus, even if the complaint could be read to assert a claim under the ADEA, plaintiff has utterly failed to come forward with evidence that would support such a claim.

tions omitted); *see generally* Fed.R.Civ.P. 15(a) (noting that leave to amend should be "freely given when justice so requires"). ERISA § 510 prohibits an employer from dismissing an employee so as to avoid paying pension benefits. *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1110–11 (2d Cir.1988). To prevail under this section, an employee must show that the "employer was at least in part motivated by the specific intent to engage in activity prohibited by § 510." *Id.* at 1111 (citations omitted); *see also Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir.1992) (noting that a plaintiff is not required to show that an employer's "sole purpose" was to interfere with pension benefits to prevail on an ERISA § 510 claim, provided he or she shows that it was at least a "motivating factor"). However, a plaintiff does not state a claim under ERISA § 510 merely by showing that a loss of pension benefits was a consequence of his or her dismissal. *Dister,* 859 F.2d at 1111. "ERISA does not guarantee every employee a job until he or she has fully vested into a company's benefit plan." *Id.*

■ Burke has failed to come forward with any evidence to suggest that Royal terminated his employment to prevent him from accruing additional pension benefits. Further, there is no evidence that Burke was close to the point of vesting. *See Humphreys,* 966 F.2d at 1044 (holding that termination of plaintiff two months prior to vesting gave rise to inference that discharge was motivated by a desire to interfere with pension benefits). Rather, Burke speculates, without any specific evidentiary support, that Royal terminated his employment to avoid incurring the health care costs associated with his diabetes, and to prevent him from accruing any additional retirement benefits. The only basis for Burke's claim appears to be his assertion that he was fired after his diabetic condition became aggravated, and before his retirement benefits had fully accrued. The Second Circuit recently discussed the fallacy in an argument similar to the one that Burke makes here:

> Although Lightfoot's complaint alleged a 'pattern or practice of age discrimination in employment intended to deprive older ... employees of opportunity to optimize the benefits available to them,' he has come forward with no specific facts to support this allegation. He argues on appeal that pre-termination discrimination against him 'must' have resulted from Carbide's desire to interfere with his pension benefits because it had that effect. This is a textbook illustration of the *post hoc ergo propter hoc* fallacy.

*Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997). For these reasons, I respectfully recommend that plaintiff's motion to amend his complaint to add a claim for discrimination under ERISA § 510 be denied.[8]

■ Burke also seeks to amend his complaint to add a claim of wrongful discharge in violation of New York State law. Defendant argues that this claim is futile as well, because Burke was an at-will employee and New York does not recognize the tort of wrongful discharge of an at-will employee. Burke does not dispute that he

8. If Burke's ADA claim were to proceed, his loss of pension benefits would be a proper element of damages. *See Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir.1993) (back pay award in Title VII case should include "lost salary, including anticipated raises, and fringe benefits"), *cert. denied,* 510 U.S. 1164, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994); *Equal Employment Opportunity Commission v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 924 (S.D.N.Y.1976) (including defendant's contributions to plaintiff's pension and profit sharing plans when calculating amount of back pay award in Title VII case), *aff'd mem,* 559 F.2d 1203 (2d Cir. 1977), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977); *see also Hukkanen v. International Union of Operating Engineers,* 3 F.3d 281, 286 (8th Cir.1993) (district court may award successful Title VII plaintiff "the present value of [his or her] interest in the pension plan as of the date of settlement") (citations omitted); *cf.* 42 U.S.C. § 12117(a) (enforcement provisions of the ADA are the same as provided for under Title VII).

was an at-will employee. *See* Am.Compl. at ¶ 8 ("Defendant is an at-will employer...."); Burke Dep. at 159–60 (acknowledging employment-at-will status); Reilly Decl., Ex. P (page from employee handbook indicating that "[t]he employment relationship that exists between Royal and each of its employees is employment-at-will."). New York, indeed, does not recognize the tort of wrongful discharge of an at-will employee. *See Murphy v. American Home Prods. Corp.*, 58 N.Y.2d 293, 300–01, 448 N.E.2d 86, 89, 461 N.Y.S.2d 232, 235 (1983) (declining to recognize the tort despite a trend in other jurisdictions toward recognizing it); *see also Sabetay v. Sterling Drug, Inc.*, 69 N.Y.2d 329, 333, 506 N.E.2d 919, 921, 514 N.Y.S.2d 209, 211 (1987) (reaffirming *Murphy* and refusing to recognize any implied agreement based on language contained in the company's policy manual). Plaintiff's wrongful discharge claim, therefore, is futile as well. Accordingly, I respectfully recommend that plaintiff's motion to amend the complaint to add a claim for wrongful discharge be denied.

### Conclusion

For the reasons stated above, I respectfully recommend that summary judgment be granted in favor of defendant Royal Insurance and that plaintiff's motion to amend the complaint be denied. Any objections to this report and recommendation must be served and filed with the Clerk of the Court within ten days of receipt of this notice and in any event no later than February 18, 1999. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).